UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

(WEST PALM BEACH DIVISION)

CASE NO. **04-80595**

ROBERT HANNA,

      Plaintiff,

vs.

WCI COMMUNITIES, INC.,
a Delaware for-profit corporation,
ALFRED HOFFMAN, JR., individually,
JERRY STARKEY, individually,
MICHAEL GREENBERG, individually,
HILLIARD M. EURE, III, individually, and
KERRY RUDOLPH, individually,

      Defendants.

_____/

## COMPLAINT AND DEMAND FOR JURY TRIAL

Plaintiff, ROBERT HANNA, sues Defendants, WCI COMMUNITIES, INC.,

ALFRED HOFFMAN, JR., JERRY STARKEY, MICHAEL GREENBERG,

HILLIARD EURE, III, and KERRY RUDOLPH, and alleges as follows:

### JURISDICTIONAL ALLEGATIONS

1.     HANNA was employed by WCI COMMUNITIES, INC. (hereinafter

"WCI") for five years, from 1999 until October 7, 2003, when he was summarily

terminated for lawfully objecting to, opposing, and providing information about,



causing information to be provided about, and assisting in an investigation regarding conduct that HANNA reasonably believes constitutes violations of a "law, rule, or regulation," violations of 18 U.S.C. §1348, violations of rules and regulations of the Securities Exchange Commission, or any provision of federal law relating to fraud against shareholders committed by WCI and its Officers, ALFRED HOFFMAN (hereinafter "HOFFMAN"), JERRY STARKEY (hereinafter "STARKEY"), MICHAEL GREENBERG (hereinafter "GREENBERG"), its internal auditor, KERRY RUDOLPH (hereinafter "RUDOLPH"), and HILLIARD M. EURE, III (hereinafter "EURE"), a director of WCI and Chairperson of WCI's audit committee. HANNA sues each of these Defendants under the Sarbanes-Oxley Act of 2002 for retaliation, and additionally sues WCI under Florida's Whistleblower's Act. HANNA seeks to recover back pay, front pay, compensatory damages, punitive damages, special damages (including but not limited to lost stock options), and his reasonable attorneys' fees and costs incurred as a result of Defendants' unlawful misconduct.

2.   Jurisdiction is proper in this court pursuant to 28 U.S.C. §1331 and 18 U.S.C. §1514A. This court has supplemental jurisdiction over HANNA's state law claims pursuant to 28 U.S.C. §1367. The actions giving rise to this litigation occurred in Palm Beach County, Florida, and, thus, venue is proper in the Southern District of Florida.

3.   HANNA is an individual who was employed by WCI for five years until his abrupt termination on October 7, 2003. He engaged in activity protected under

2

the Sarbanes-Oxley Act, 18 U.S.C. §1514A, and the Florida Whistleblower's Act, §448.101, Fla. Stat.  He is a citizen of the United States and resides in the Southern District of Florida.

4.    Defendant HOFFMAN is, and at all material times was, an officer, employee and agent of WCI within the meaning of the Sarbanes-Oxley Act, 18 U.S.C. §1514A.  HOFFMAN was and is the founder and Chief Executive Officer of WCI, exercised supervisory authority over HANNA, and had the authority to investigate, discover, or terminate the misconduct about which HANNA complained and/or opposed.  HOFFMAN, through WCI, conducts business in the Southern District of Florida.

5.    Defendant STARKEY is, and at all material times was, an officer, employee and agent of WCI within the meaning of the Sarbanes-Oxley Act, 18 U.S.C. §1514A.  STARKEY, President of WCI, exercised supervisory authority over HANNA, and had the authority to investigate, discover, or terminate the misconduct about which HANNA complained and/or opposed. STARKEY, through WCI, conducts business in the Southern District of Florida.

6.    Defendant GREENBERG is, and at all material times, was, an officer, employee and agent of WCI within the meaning of the Sarbanes-Oxley Act, 18 U.S.C. §1514A.  GREENBERG, Senior Vice President of the Home Building and Real Estate Services of WCI, exercised supervisory authority over HANNA and had the authority to investigate, discover, or terminate the misconduct about which

3

HANNA complained and/or opposed.   GREENBERG, through WCI, conducts business in the Southern District of Florida.

7.   Defendant EURE is, and at all material times, was, a director and agent of WCI within the meaning of the Sarbanes-Oxley Act, 18 U.S.C. §1514A.   As the Chairman of WCI's audit committee charged with the responsibility of ensuring compliance with applicable accounting and disclosure rules, EURE had the authority to investigate, discover, or terminate the misconduct about which HANNA complained and/or opposed. EURE, through WCI, conducts business in the Southern District of Florida.

8.   Defendant RUDOLPH is, and at all material times, was, an employee and agent of WCI within the meaning of the Sarbanes-Oxley Act, 18 U.S.C. §1514A. RUDOLPH, the Internal Auditor of WCI, had the authority to investigate, discover, or terminate the misconduct about which HANNA complained and/or opposed. RUDOLPH was specifically designated by WCI as its agent to whom reports of misconduct such as those brought by HANNA could be brought in confidence, and WCI charged RUDOLPH with the authority and obligation to investigate and address Sarbanes-Oxley complaints or concerns.   RUDOLPH, through WCI, conducts business in the Southern District of Florida.

9.   Defendant WCI is a Delaware, for-profit corporation that is authorized to conduct business, and does conduct business, in the Southern District of Florida. WCI owns substantial property in this district and maintains offices in this district. WCI is a publicly traded corporation with a class of securities registered under

4

section 12 of the Securities Exchange Act of 1934 (15 U.S.C. §78l), and which is required to file reports under section 15(a) of the Securities Exchange Act of 1934 (15 U.S.C. §78o(d)).  WCI is a publicly traded company subject to the provisions of the Sarbanes-Oxley Act of 2002.  WCI is also an "employer" within the meaning of Florida's Whistleblower Act, §448.101, et seq., Fla. Stat.

## CONDITIONS PRECEDENT

10.    Pursuant to 29 C.F.R. §1980.114(a), on or about December 12, 2003, HANNA timely filed an administrative complaint with the United States Department of Labor, Secretary of Labor, with a copy to the Occupational Safety and Health Association Area Director.  More than 180 days have passed since the filing of that complaint without the issuance of a final decision by the Secretary of Labor.  HANNA has given advance notice of his intent to file this proceeding as required by 29 C.F.R. §1980.114(b).

11.    HANNA has satisfied all conditions precedent to the filing of this Complaint.

## GENERAL ALLEGATIONS

12.    WCI is a homebuilding and real estate services company that focuses its business on master-planned communities primarily in the State of Florida.  Its homes range in price from $100,000 to over $10 million.  WCI has developed more than thirty communities in Florida.

13.    HANNA, a civil engineer by education and training, has substantial experience in the home-building industry in South Florida.  In 1999, HANNA was

recruited by WCI to serve as WCI's project manager for Harbour Isles, a luxury waterfront residential development in the Village of North Palm Beach in Palm Beach County. HANNA successfully managed the project, as well as various other projects that were assigned to him. HANNA received a series of promotions, with accompanying increases in compensation, right through his compensation review in June 2003, only a few months before his termination.

14.     As a result of his superior job performance, HANNA was promoted in January 2002 to President of WCI's Palm Beach County and Treasure Coast Homebuilding Division. As such, HANNA continued to maintain his office in Palm Beach County. In announcing this promotion, GREENBERG sent an e-mail to "everyone" at WCI that stated, among other things, that:

> During Robert [HANNA's] three years at WCI he has demonstrated himself as an extremely talented and effective leader. He has spear headed our high end buyer program with high customer ratings and 120% over plan for the past two years as just part of the many responsibilities he has had. Robert's promotion is the result of his hard work, dedication, and experience.

15.     Other high-level WCI executives were equally pleased with HANNA's promotion. STARKEY offered HANNA his congratulations on the promotion via e-mail, stating: "Congratulations! Thanks for the hard work and success over the past two years. I look forward to your continued growth and success as a very significant contributor to WCI's success." Jim Dietz, WCI's Chief Financial Officer, also congratulated HANNA on his promotion: "Robert, I am delighted to hear of your promotion. You have shown yourself to be a person of the utmost integrity and

talent and are very deserving of this new challenge." Likewise, GREENBERG sent a personal e-mail to HANNA stating that: "You have worked very hard these past years and have earned the respect of all of us."

16.    HANNA's performance after his promotion was equally successful: up through September 2003, HANNA's division was the second most profitable in WCI, second only to WCI's Homebuilding division in Broward County, which was headed by Armando Goenaga.

17.    As HANNA's responsibilities grew, so did his salary and bonuses. HANNA has always received the maximum target bonus, or more. For example, in both 2001 and 2002, HANNA received substantially in excess of his target bonus. His 2002 bonus was paid to him in February 2003. As of January 1, 2003, HANNA's base salary was increased substantially, as a result of his strong job performance.

18.    Through the years, he was also granted stock options with WCI which were, in and of themselves, very valuable. In April 2003, HANNA was awarded 17,209 additional stock options in WCI. HANNA was informed of this discretionary award by HOFFMAN and STARKEY via memorandum, in which they stated that WCI's Board of Directors had chosen to issue stock option awards "for certain employees who significantly contribute to the success of the Company and truly stand out among their peers" and that HANNA was "one of those individuals being recognized for [his] efforts on behalf of WCI to date, and for [his] future potential within [WCI]."

## EVENTS LEADING UP TO HANNA'S WRONGFUL TERMINATION

19.     WCI announced its initial public offering on March 12, 2002.    The Company's first business plan after the initial public offering was for the year 2003. The initial draft for the plan was prepared in each division within WCI, with HANNA and his staff spending months compiling data and preparing the business plan for his division.  HANNA's plan called for 275 home closings in his division's then-largest project, Evergrene, in Palm Beach County.  This plan was reviewed and approved by GREENBERG.

20.     In October or early November 2002, STARKEY and GREENBERG met with the division presidents, including HANNA, to review the 2003 business plan. At that meeting, with no stated reasoning or analysis, STARKEY announced that the number of home closings for the Evergrene development in HANNA's division was increased by 24%.  Similar significant, arbitrary and unexplained increases were made to other divisions.  These numbers were dictated by STARKEY, were arrived at with no discussion, and were unattainable and misleading.

21.     At the meeting in late October or early November 2002 where STARKEY mandated arbitrary and significant changes to the business plan, HANNA objected to and opposed those changes.  HANNA was very concerned (and voiced those concerns) about the arbitrary changes being made to WCI's business plan.  HANNA was concerned that the business plan was not reasonable or realistic, and that there was a significant likelihood that the plan (as mandated by STARKEY) could mislead the investing public.  WCI shares its business plan,

8

including the expected revenues and profit, as well as the number of projected home

closings, with market analysts who use the plan and other materials to form

opinions on the value of WCI's stock, which opinions are then reported to the public.

WCI's business plan forms the basis of a "range" which WCI communicates to the

public as its earnings guidance.  At the meeting, STARKEY instructed HANNA to

drop the subject.

     22.    HANNA also believed that WCI's top officials, including HOFFMAN

and STARKEY, were knowingly misleading investors, as evidenced by their

creation of a "cushion fund" to guarantee their bonuses because they expected the

company to fall short of the unreasonably high projections published in its business

plan.  Because the numbers underlying these business plans were arbitrary, and

because WCI knew this information was going to be used by third parties in valuing

WCI's stock, HANNA had a reasonable basis to believe that WCI's actions violated

federal laws relating to fraud against shareholders, violations of 18 U.S.C. §1348, or

rules and regulations of the Securities Exchange Commission.

     23.    HANNA also voiced concerns about WCI's practice of selling land,

which had previously been planned for development by WCI, shortly before the end

of reporting periods.  This practice was solely for the purpose of inflating profits

during reporting periods where WCI otherwise would have fallen short of earnings

expectations.  This practice was misleading to the investing public, because it gave

the false impression that the business plan projections were being met when, in

fact, they were not, since the land had not been slated for sale in the business plan

and the practice served to deplete WCI's assets. Additionally, the sales themselves were falsely identified to the investing public: WCI stated in its public filings that these last-minute sales were of "non-strategic parcels," i.e., parcels that were not slated for development in WCI's business plan, when, in fact, they were "strategic parcels" that made up part of WCI's forecasted profits and home closings. As a recent example, upon information and belief, at the end of 2003, WCI sold approximately 40 strategic lots from its Broward Homebuilding division, which had been slated for development by WCI, at prices between $300,000 and $450,000, for a total of over $12 million (WCI's 2003 net income exceeded its 2002 net income by only $1 million). These sales were for the sole purpose of meeting its profit projections, and the true purpose and nature of the end of period land sales were not disclosed to the public.

24. The obvious motivation for WCI's manipulation of its business plan and false reporting of profit sources was to conceal the company's poor performance relative to other companies in the industry, excessive compensation being paid to senior executives (such as HOFFMAN), and to increase the value of the stock options and stock grants that WCI's senior executives had received. Despite the fact that WCI's profit increased only one percent from 2002 to 2003, the lowest percentage change of twenty-one home-building companies ranked in the May 2004 issue of BIG BUILDER Magazine (**Exhibit 1**), HOFFMAN received $3.6 million in salary and bonuses from WCI, plus $106,000 in "other" compensation. HOFFMAN is the beneficial owner of 5,238,096 shares of WCI stock (11.9%).

25.     Because information from the business plan was used by WCI in formulating forecasts and projections, and was used by third parties in valuing WCI's stock, and because the investing public relies upon a publicly-traded corporation's profit forecasts in determining a stock's value, HANNA reasonably believed that WCI's actions (through HOFFMAN, STARKEY, GREENBERG, EURE, and RUDOLPH) violated federal laws, rules or regulations relating to fraud against shareholders, and which otherwise constituted a violation of a "law, rule or regulation."

26.     The Sarbanes-Oxley Act was enacted in the midst of numerous corporate scandals that rocked the foundation of American trust in corporate America. As stated by President Bush when he signed the Sarbanes-Oxley Act into law on July 30, 2002:

> This law sends very clear messages that all concerned must heed. This law says to every dishonest corporate leader: you will be exposed and punished; the era of low standards and false profits is over; no boardroom in America is above or beyond the law. ... The law says to workers: we will not tolerate reckless practices that artificially drive up stock prices and eventually destroy the companies, and the pensions, and your jobs. And this law says to every American: there will not be a different ethical standard for corporate America than the standard that applies to everyone else.   The honesty you expect in your small businesses, or in your workplaces, in your community or in your home, will be expected and enforced in every corporate suite in this country.

27.     In July 2002 and for the year that followed, Americans were being inundated on a daily basis with reports of corporate misdeeds and misappropriations.

28.    Meanwhile, HANNA was being exposed to reports of similar wrongdoing at his own company, as well as factual circumstances that led HANNA to the inescapable conclusion that WCI officials were behaving inappropriately. These reports include, but are not limited to:

A.    Top officials at WCI giving special consideration to "friends" of the company – i.e., those who had contributed to political campaigns of candidates endorsed by HOFFMAN -- when subcontracts were awarded and pressuring HANNA to give preference to contributors to the Republican party because of HOFFMAN's ties to that political party;

B.    WCI contractors performing personal work for top WCI executives, including STARKEY, which was paid for by WCI, and for which WCI later adopted an internal "amnesty program" to exonerate the wrongdoers;

C.    Ongoing and routine manipulation of business plan numbers to conceal problem areas and lackadaisical sales performance, by, for instance, insisting that some divisions, which had achieved the projected profitability, transfer some of their profit to other unprofitable divisions so these other divisions did not appear to investors to be unprofitable; and

        D.     STARKEY ordering the payment of a large bonus to a female marketing employee with whom he enjoyed a personal relationship, even after the employee's Division President, Project Manager and the Senior Vice President of Marketing had disapproved of the bonus.

29.    In or around February or March 2003, each of the division presidents attended a meeting at WCI's corporate office, along with STARKEY, WCI's Chief Financial Officer, and WCI's in-house counsel, to discuss steps WCI needed to take to comply with mandates of the Sarbanes-Oxley Act.  At that meeting, an independent consultant, Protivity, anonymously polled WCI's executives, seeking to determine the largest risks facing WCI on a going-forward basis.  The foremost risk to the company raised by the executives was the likelihood that WCI would fail to meet the business plan that was arbitrarily imposed by STARKEY and HOFFMAN. Also at this meeting, RUDOLPH was introduced as WCI's internal auditor.  The attendees at this meeting were told that complaints related to Sarbanes-Oxley issues could be brought to RUDOLPH and would be treated confidentially.

30.    In June 2003, HANNA received his annual compensation review which was generally very favorable (the only issue raised with respect to HANNA's performance was relating to the Evergrene project, which is discussed in paragraphs 48 through 51, below).  At his meeting with GREENBERG to discuss his review, HANNA again raised the issue of the arbitrary changes that were made by STARKEY to the business plan, as well as last-minute land sales that were being

used to inflate WCI's reported profits.  HANNA indicated to GREENBERG that, as a result of WCI's failure to address his previous complaints about the same activity, HANNA was considering discussing these issues with WCI's newly-appointed internal auditor, RUDOLPH.  HANNA advised GREENBERG that he had similar concerns regarding the 2004 business plan, which was in the process of being developed. GREENBERG took no action with respect to HANNA's complaints.

31.    In late September 2003, RUDOLPH made a routine business visit to HANNA's division.  Late that afternoon, HANNA met with RUDOLPH privately and advised him of his serious concerns about the business plan for the current year, 2003, and the following year, and the way in which land was being sold to give the misimpression to the public that the business plan was being met.  HANNA advised RUDOLPH that he was very concerned about retaliation for reporting these financial improprieties, and confidentially sought RUDOLPH's advice on how to proceed.   RUDOLPH advised HANNA that RUDOLPH had recently received similar complaints from Armando Goenaga, President of WCI's Broward County Homebuilding Division.   HANNA asked RUDOLPH to keep their conversation confidential, as he was very concerned about retaliation, particularly in light of the previous responses to his articulated concerns about the same issues.

32.    Even though RUDOLPH was designated by WCI as the person to whom concerns such as HANNA's could be expressed in confidence, instead of dealing directly with HANNA's concerns, RUDOLPH suggested that HANNA could

report these issues to EURE, a retired PeatMarwick partner who was the chairman of WCI's audit committee.

33.    Thereafter, HANNA learned that RUDOLPH had violated HANNA's confidence and advised GREENBERG that HANNA and Mr. Goenaga had complained and that HANNA intended to bring the issues to EURE.  HANNA also learned that, a few days after HANNA's complaint, GREENBERG instructed Mr. Goenaga not to take his concerns to EURE, and also instructed Mr. Goenaga to advise HANNA to do the same.  Mr. Goenaga agreed not to approach EURE at that time, and advised HANNA of GREENBERG's instruction.   HANNA confronted RUDOLPH about his breached confidence, and RUDOLPH admitted he had spoken to GREENBERG about HANNA's complaints and HANNA's intent to report WCI's illegal conduct to EURE and WCI's audit committee.

34.    HANNA has also learned that only a few hours after his supposedly "confidential" conversation with RUDOLPH about WCI's financial improprieties and misleading public disclosures (which RUDOLPH unabashedly admitted disclosing), STARKEY sent an e-mail to Paul Appolonia ("Appolonia"), WCI's Senior Vice President of Human Resources, suggesting that HANNA be replaced by Charlie Brasington (an existing WCI employee).

35.    At approximately 5:00 p.m. on October 7, 2003, only two weeks or so after his conversation with RUDOLPH concerning WCI's financial practices, GREENBERG (HANNA's immediate supervisor) and Appolonia came to HANNA's office in North Palm Beach, and told HANNA he was being terminated.

36.    HANNA's termination was completely without warning and HANNA was forced to vacate his office immediately.  HANNA was stunned.  HANNA was not given any real justification for his termination, but instead was told only that the company wanted a "coaching change."   No mention was made of any performance issues.

37.    HANNA's termination was only two days before HANNA was scheduled to review the 2004 proposed business plan.  The timing of HANNA's termination can lead to no other logical conclusion than this – the trigger for firing HANNA was his complaints to GREENBERG and RUDOLPH.

38.    A half-hour after HANNA's termination, GREENBERG and Appolonia met with HANNA's key staff, and falsely told them that HANNA had resigned.  HANNA was replaced by Charles Brasington, a WCI employee who was transferred internally and assigned as both the Eastern Regional President and to HANNA's position, President of the Palm Beach and Treasure Coast Homebuilding Division.  Mr. Brasington, a personal friend of STARKEY's and HOFFMAN's, was selected because they knew that Mr. Brasington would not "rock the boat" as HANNA had.

39.    Within a few hours after being told that he was summarily terminated, HANNA spoke with Armando Goenaga, the head of WCI's Broward Homebuilding division.  Later that night, Mr. Goenaga sent an e-mail memorandum to RUDOPH, with a copy to HANNA, expressing similar concerns as those that had been voiced by HANNA.  Like HANNA, Mr. Goenaga expressed his concern that the numbers that were arbitrarily dictated by STARKEY were unattainable, "misleading to

16

anyone who would rely on them," and could only be met through last-minute sales of land that had been slated in the business plan for future development.

40.     In his e-mail, Mr. Goenaga requested to remain anonymous due to "fear of retaliation, especially from Jerry [STARKEY]." Like HANNA, Mr. Goenaga believed that if his name were to get to STARKEY as being the person who complained, there would be significant retaliation against him.  A copy of this e-mail is attached as **Exhibit 2.**

41.     Upon information and belief, WCI's 2004 business plan contained the same types of arbitrarily inflated numbers as the 2003 plan, and was not supported by a reasonable belief that the goals could be attained without WCI again selling land to meet projected profit shortfalls.

42.     Upon information and belief, STARKEY held a manager's meeting on October 16, 2003 to discuss WCI's 2004 business plan.  In attendance at that meeting were RUDOLPH, Vivien Hastings (WCI's in-house General Counsel), and Paul Appolonia (WCI's Senior Vice President for Human Resources).   The attendance by these three persons at this meeting was highly unusual.  STARKEY repeatedly emphasized in this meeting that WCI is a "growth" company, and that the business plan needed to provide for even higher profitability.   The indisputable inference that arises from having these senior executives present at this meeting is that dissenters (such as HANNA) would be terminated as HANNA was.

43.     At the conclusion of this October 16th meeting, STARKEY approached Mr. Goenaga.  Upon information and belief, Mr. Goenaga advised STARKEY that

he was angry and upset because of the manipulation of the business plan process and because HANNA had been terminated. STARKEY apologized to Mr. Goenaga, and gave him a check for $50,000. The unmistakable inference was that WCI intended the $50,000 to buy Mr. Goenaga's cooperation and silence. HOFFMAN, the Chairperson of WCI's Board of Directors, was integrally involved in offering the intended payoff to Mr. Goenaga.

44.    In the months since WCI unlawfully terminated HANNA's employment, a large number of key high-level WCI employees, including without limitation the Vice President of Land Development (Ken Tuma), Financial Manager (Donna Bryson), President of the company's realty arm, WCI Prudential (Roger Herman), and many others, have left the company.   Mr. Goenaga also resigned from WCI on or about the end of May 2004, but, in a continued effort to secure his "cooperation," WCI has offered Mr. Goenaga a contract under which he would be required to work only one day per week at WCI, but would continue to receive his full (six figure) salary. This mass exodus has left the company in a state of internal turmoil and disarray, and shows a lack of satisfaction with the way WCI is being operated.

## WCI'S PRETEXTUAL ASSERTIONS ABOUT THE REASON FOR HANNA'S TERMINATION

45.    Even though no "performance" issues were raised at HANNA's termination, WCI has since claimed that HANNA's termination was due to "job performance."   This assertion is demonstrably false and legally irrelevant.

HANNA's articulated concerns about WCI's misleading financial disclosures and omissions were clearly a primary motivating factor for HANNA's termination.

46.    HANNA was consistently praised for his job performance.  The old adage "Money Speaks Louder than Words" is particularly apt here:  if HANNA really had performance deficiencies, as WCI now claims, why would the company promote him up through the ranks to President of a large division, give him favorable performance reviews (including one just four months before his abrupt termination), give him substantial stock options just before his termination, continue increasing his compensation, award him well in excess of his target bonus each year, and substantially increase his 2003 compensation?  Clearly, there were no performance issues with HANNA that would have warranted his abrupt termination on October 7, 2003.

47.    Despite WCI's recently fabricated claims of "job performance" issues, WCI cannot dispute that HANNA was never given any discipline, written or otherwise, relating to his job performance.  Nor can WCI dispute that HANNA's division's sales were second in the entire company.    In fact, all claims of dissatisfaction with HANNA's performance occurred <u>only after</u> HANNA initially conveyed his concerns to STARKEY in October or November 2002, to GREENBERG in June 2003, and to RUDOLPH on September 22, 2003.  Significantly, no criticism was conveyed to HANNA until <u>after</u> his termination. [1]

---

[1] Notably, WCI never shared any of HANNA's supposed job performance issues with him prior to or at the time of his termination, but instead raised these issues for the first time after HANNA filed his Sarbanes-Oxley complaint with OSHA.

48.    At the crux of WCI's contention that HANNA's performance caused his termination, WCI cites issues that arose at Evergrene, a 350-acre, 1,000 unit master-planned community in Palm Beach Gardens, Florida with prices ranging from $200,000 to $700,000.  There were certainly issues (as there are in any large development), but they were not of HANNA's making and HANNA solved the issues rather than caused them.

49.    HANNA inherited the Evergrene project from STARKEY and STARKEY's personal friend and the architect for the project, Marco Ruiz.  HANNA was assigned to the project during the preconstruction phase (but post planning phase), and preconstruction sales were strong.  However, when customers started moving into the Evergrene homes,[2] customers began complaining about the floor plans and construction quality.  With respect to the architectural plans drawn up by Mr. Ruiz and approved by STARKEY, the problems included, but were not limited to, small and unfurnishable rooms, window placements that were unworkable, numerous architectural errors, and an insufficient number of single floor homes to meet demand.  Additionally, after the construction of the "Mansions at Evergrene – Phase I," customers informed WCI that they could hear their neighbors through the walls of their townhomes.  WCI commissioned a University of Florida professor, Gary Siebein, to review the issue and recommend solutions.  During the review process, HANNA learned that the cross section of the wall between the homes fell short of HUD requirements and industry standards for attached home products. Professor Siebein's recommendations were implemented into Phase II and no sound

---

[2] The first closings at Evergrene were in December 2002.

transmission issues were reported with respect to Phase II of the Mansions at Evergrene. HANNA was left to deal with the fallout caused by STARKEY's and Ruiz's mistakes on Phase I, and was instructed by GREENBERG to quietly pacify the customers who had vocalized complaints without admitting that there were problems, and ignore the sound-transmission problems with respect the rest of Phase I.

50.    As sales started to slack off at Evergrene, due to the structural and design problems, pricing issues, issues relating to the economy, geopolitical risks (i.e., the Iraq war), and the glut of investor purchased homes during the pre-construction phase that were up for resale (and thus competing directly against WCI's pre-construction phase homes), HANNA finally convinced GREENBERG to make adjustments to the floor plans and pricing to improve sales. In conjunction with managerial changes that HANNA made on the project, the new floor plan changes were met with very positive consumer response, and sales were again strong in August, September and October 2003. HANNA's June 2003 review by GREENBERG (less than four months before his termination) clearly demonstrates that he was successfully addressing the problems at Evergrene. GREENBERG assigned HANNA a rating of "4" in the category of "quality of work output", even while expressly acknowledging the problems at Evergrene, which WCI now claims formed the basis of its decision to terminate HANNA. GREENBERG recognized that HANNA was appropriately managing the project: "The changes in personnel

and your micromanaging as of late is putting us back to the high standards that you exhibited before the Evergreen [sic] issue."

51.   HANNA's June 2003 review, in which he scored a 4 on a scale of 1 to 5 in all but two categories, and a score of 5 out of 5 in the category of "integrity and trust" further demonstrates that there was no legitimate reason to terminate HANNA for "job performance."   Pertinent comments from GREENBERG on HANNA's June 2003 performance review included:

   a. "You welcome new ideas and are open-minded about different approaches. ..."

   b. "You meet general expectations" with respect to timeliness of delivery.

   c. "You are [a] well respected leader that gets a lot ou[t] of your team because of your commitment to the company."

   d. "Others trust that you will use your experience and wisdom to find the best solution. ..."

   e. "You know what products, services, and features customers want or need and can easily project a product's success. ..."

52.   HANNA's termination, shortly after he had provided confidential information to RUDOLPH (which RUDOLPH admitted sharing with GREENBERG) regarding WCI's improper conduct, and shortly after HANNA indicated to RUDOLPH that he was considering taking his complaints to WCI's audit committee, was clearly a retaliatory act motivated wholly or in part by HANNA's protected activity.   Even after HANNA filed his administrative claim detailing the misleading information being provided to the investing public, WCI

and its audit committee, including EURE, rubber stamped the decision to terminate HANNA, and have taken no steps to rectify WCI's objectionable practices.

### COUNT I (SARBANES-OXLEY ACT VIOLATIONS)

53.   HANNA realleges and readopts the allegations contained in paragraphs 1 through 52 above as if fully set forth herein.

54.   Despite the serious threat of retaliation by WCI and its senior officers, HANNA opposed and complained about the arbitrary manipulation of the business plan and the inappropriate practice of selling land (which was not slated for sale) at the end of reporting periods for the purpose of giving the investing public the misimpression that WCI was meeting its inflated business plan.

55.   HANNA engaged in activity protected under the Sarbanes-Oxley Act by providing information about and assisting in an investigation into conduct which he reasonably believes constitutes fraud against shareholders or violations of rules and regulations of the Securities and Exchange Commission.  HANNA's complaints were to persons with supervisory authority over him and to persons with the authority to investigate, discover or terminate the misconduct.

56.   HOFFMAN, STARKEY, GREENBERG, EURE and RUDOLPH conspired to terminate HANNA's employment.  The real reason (and, at the very least, a motivating factor) for HANNA's termination was the serious concerns he had expressed to STARKEY, GREENBERG, and, most recently, to RUDOLPH, the company's internal auditor, about the arbitrary and misleading nature of WCI's business plans, the arbitrary manipulation of those plans by WCI's top executives,

and WCI's hurried sale of lands (which were meant to be used for future development rather than quick sale) to generate money to give the false appearance to the investing public that WCI was meeting its sales goals and projections.

57.   HANNA reasonably believed at the time of communicating these concerns to WCI, and continues to reasonably believe, that WCI's actions violate federal laws relating to fraud against shareholders or violations of rules or regulations of the Securities and Exchange Commission.   WCI's unlawful termination of HANNA was in retaliation for HANNA's communicating his serious concerns to WCI's internal auditor and to other high-ranking WCI officials, and for advising these persons that he intended to take his concerns to others at WCI, including members of the audit committee of WCI's Board of Directors such as EURE.

58.   The misconduct described above was willful and wanton in that WCI, STARKEY, GREENBERG, HOFFMAN, EURE and RUDOLPH are well aware of the requirements of federal securities laws and the Sarbanes-Oxley Act's prohibition against retaliating against persons who engaged in such protected activity, but took action against HANNA despite such knowledge. The conduct of Defendants deprived HANNA of his rights under the Sarbanes-Oxley Act to report actions that he reasonably believes constitute violations of securities laws and regulations without fear from retaliation.

59.   As a direct, natural, foreseeable and proximate result of the actions and inactions of Defendants, HANNA has suffered injuries and losses including the

violation of his statutory rights, back pay (including the value of his lost stock options) and special damages including attorneys fees and costs, compensatory damages, all of which injuries and losses are continuing and permanent in nature.

WHEREFORE, HANNA prays for the following relief against HOFFMAN, STARKEY, GREENBERG, EURE, RUDOLPH, and WCI:

A.    Entry of a judgment for restitutionary, compensatory, punitive damages, and special damages, including, but not limited to, damages for injury of reputation, back pay with prejudgment and postjudgment interest, lost stock options, front pay, and any other special damages and equitable and legal relief deemed appropriate by this court; and

B.    Awarding HANNA the costs incurred in this action, including reasonable attorney's fees, costs, and expert fees as provided for under the Sarbanes-Oxley Act; and

C.    Enjoining Defendants from willfully violating the rights of employees who engage in protected activity under the Sarbanes-Oxley Act, and ordering such other and further relief as this Court deems just and proper.

## COUNT II (FLORIDA'S WHISTLEBLOWER ACT)

60.    HANNA realleges and readopts the allegations contained in paragraphs 1 through 52 and 54 through 59 above as if fully set forth herein.

61.     WCI's actions that HANNA objected to and opposed constitute violations of a "law, rule, or regulation" as defined by Florida's Whistleblower Act, §448.101. *et seq.*

62.     HANNA objected to and refused to participate in WCI's activities that he reasonably believed (and continues to believe) constitute violations of a "law, rule, or regulation" as those terms are used in Florida's Whistleblower's Act. HANNA engaged in protected activity under Florida's Whistleblower's Act.

63.     HANNA's protected activity was the reason for, or at the very least a contributing factor in, his termination, and HANNA's termination and protected activity are not completely unrelated.

64.     WCI's actions were willful, malicious, deliberate, and were taken by Defendants, its agents and employees, in reckless disregard of HANNA's rights under Florida's Whistleblower's Act.

WHEREFORE, HANNA prays for the following relief against WCI:

A.      Entry of a judgment against WCI for restitutionary, compensatory, and punitive damages, including, but not limited to, injury for damages to his reputation, lost stock options, back pay with prejudgment and postjudgment interest, front pay, and any other equitable and legal relief deemed appropriate by this court; and

B.    Award of the costs incurred in this action, including reasonable attorney's fees, costs and expert fees as provided for under Florida's Whistleblower Act; and

C.    Enjoining WCI from willfully violating the rights of employees who complain about or oppose conduct in violation of any "law, rule or regulation," and ordering such other and further relief as this Court deems just and proper.

## DEMAND FOR JURY TRIAL

Plaintiff hereby demands trial by jury of all issues triable as of right by jury.

DATED this _30th_ day of June, 2004.

Respectfully submitted,

BEASLEY & HAUSER, P.A.
505 South Flagler Drive, Suite 1500
West Palm Beach, Florida 33401
Beasley@beasleylaw.net
Telephone: (561) 835-0900
Facsimile: (561) 835-0939

By: _____

JAMES W. BEASLEY
FLORIDA BAR NO. 145750
PATRICIA A. LEONARD
FLORIDA BAR NO. 0065455
ROBYN S. HANKINS
FLORIDA BAR NO. 0008699

EXHIBIT

1

# FORTIFIED FINANCIAL

I                                    wyatt Kash

| ROE RANK | COMPANY (TICKER SYMBOL) | TTM PERIOD ENDING | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 1 | **NVR** (NVR) | 12/31/03 | 86% | 78% | 53% | 43% | $3,687 | $3,136 | 18% | $420 | $332 | 27% |
| 2 | **Hovnanian Enterprises** (HOV) | 10/31/03 | 38% | 23% | 17% | 10% | $3,202 | $2,551 | 26% | $257 | $138 | 87% |
| 3 | **William Lyon Homes** (WLS) | 12/31/03 | 35% | 59% | 11% | 15% | $1,184 | $957 | 24% | $72 | $50 | 46% |
| 4 | **Orleans Homebuilders** (OHB) | 12/31/03 | 35% | 31% | 14% | 9% | $437 | $360 | 21% | $30 | $22 | 38% |
| 5 | **The Ryland Group** (RYL) | 12/31/03 | 32% | 25% | 19% | 13% | $3,444 | $2,877 | 20% | $242 | $186 | 30% |
| 6 | **Lennar Corp.** (LEN) | 11/31/03 | 28% | 26% | 17% | 15% | $8,908 | $7,236 | 23% | $751 | $545 | 38% |
| 7 | **KB Home** (KBH) | 11/31/03 | 27% | 27% | 12% | 10% | $5,851 | $5,031 | 16% | $371 | $314 | 18% |
| 8 | **Centex Corp.** (CTX) | 12/31/03 | 27% | 20% | 15% | 11% | $10,436 | $8,361 | 25% | $724 | $477 | 52% |
| 9 | **Meritage Corp.** (MTH) | 12/31/03 | 26% | 29% | 14% | 17% | $1,471 | $1,120 | 31% | $94 | $70 | 35% |
| 10 | **Brookfield Homes** (BHS) | 12/31/03 | 25% | 17% | 21% | 11% | $1,023 | $842 | 22% | $88 | $43 | 104% |
| 11 | **D.R. Horton** (DHI) | 12/31/03 | 25% | 23% | 13% | 11% | $9,188 | $7,349 | 25% | $700 | $443 | 58% |
| 12 | **MDC Holdings** (MDC) | 12/31/03 | 24% | 26% | 15% | 16% | $2,920 | $2,319 | 26% | $212 | $167 | 27% |
| 13 | **Standard Pacific Corp.** (SPF) | 12/31/03 | 24% | 21% | 12% | 11% | $2,360 | $1,885 | 25% | $204 | $119 | 72% |
| 14 | **M/I Homes** (MHO) | 12/31/03 | 22% | 22% | 16% | 13% | $1,070 | $1,033 | 4% | $82 | $67 | 23% |
| 15 | **Dominion Homes** (DHOM) | 12/31/03 | 22% | 19% | 12% | 8% | $564 | $492 | 15% | $32 | $25 | 30% |
| 16 | **Toll Brothers** (TOL) | 10/31/03 | 21% | 21% | 10% | 10% | $2,775 | $2,329 | 19% | $260 | $220 | 18% |
| 17 | **Pulte Homes** (PHM) | 12/31/03 | 20% | 18% | 12% | 11% | $9,049 | $7,472 | 21% | $625 | $454 | 38% |
| 18 | **Beazer Homes USA** (BZH) | 12/31/03 | 20% | 19% | 11% | 10% | $3,287 | $2,852 | 15% | $183 | $136 | 34% |
| 19 | **Technical Olympic USA** (TOUS) | 12/31/03 | 18% | 21% | 8% | 10% | $1,687 | $1,414 | 19% | $83 | $72 | 15% |
| 20 | **WCI Communities** (WCI) | 12/31/03 | 15% | 25% | 7% | 9% | $1,452 | $1,212 | 20% | $106 | $105 | 1% |
| 21 | **Avatar Holdings** (AVTR) | 12/31/03 | 8% | 3% | 6% | 2% | $253 | $190 | 33% | $18 | $6 | 230% |
| | **GROUP TOTAL / AVERAGE** | | 28% | 26% | 15% | 12% | $74,247 | $61,016 | 22% | $5,554 | $3,988 | 39% |



**EXHIBIT**

2

| | |
|---|---|
| | Close |

| | |
|---|---|
| **From:** | Armando Goenaga |
| **To:** | Kerry Rudolph |
| **Cc:** | Robert Hanna |
| **Subject:** | CONFIDENTIAL |
| **Sent:** | 10/7/03 9:59 PM |

**Importance:** High

Michael Greenberg spoke with me last week and informed me that you had spoken with him. He suggested that Robert and I should wait to see how the budget process works this year. I spoke with Robert and we both agree to wait.

However, waiting to see what happens this year does not erase the problem I explained to you the week before. I will recap the issue I raised to you, as our Director of Internal Audit, for clarification purposes and well as for documentation. As I mentioned, I feel an obligation to advise you of this because it was identified as a significant risk at our risk assessment meeting. Robert and I have addressed this with Michael but we feel like his hands are tied. We do not feel like we can address this directly with Jerry and have it be constructive. Therefore, I address it to you and ask that you keep this confidential. Again, I wish to remain anonymous due to fear of retaliation, especially from Jerry Starkey. If you feel that my concerns are valid, you may wish to present them to the board member in charge of audits. If he feels the concerns are legitimate, then perhaps he could ask you to do a review of why several divisions are not making their plan or why we keep having to sell land to make plan. By doing these review the facts of how the budget increases happened will come to the surface and I can remain anonymous. I think you would find similar concerns with others.

At our team WCI meeting with the Protivity consultant, a number of business risks were identified by all the WCI staff in the room. After identifying all the different risks, the group voted to categorize the risks. To the best of my recollection (I will dig up the report and review it) the risks were categorized with regard to the significance (major or not major) and likelihood of occurring.

One of the top risks that was identified as being both significant and likely to occur, was the risk of having a business plan that was not attainable. The case in point is the business plan that we have this year. At budget time last year my division presented the 2003 budget to Michael Greenberg. He reviewed it with his staff and later met with me and my staff. Michael challenged us with a few overhead items and closings. Changes were made to the plan. I believe the net margin grew by one or two million dollars. This did not surprise or upset me because the changes were discussed at length and they all made sense. Even more importantly, Michael was able to debate them with us and made us all agree that it was attainable and consequently we all bought in.

Several weeks later all of the division presidents were asked to a meeting with Jerry Starkey, Jim Dietz, and John Ferry. Michael and Tom were present but they did not run the meeting and did not say much. One by one the division presidents were directed to increase their plans. It quickly became clear that the objective was to increase everyone's plan so that at the end of the exercise,

the consolidated margin for the company was where they wanted it to be. There was very little discussion. I don't know what number they were trying to get to but I gathered that they wanted to reach a number that was not less then the year before.

The concern, which is consistent with the risk identified above, is that no consideration was given to market conditions, timing of product development, sales trends, timing of entitlements, permits approvals, timing of development, etc. It was a one way street. With one short meeting and no discussion, our divisions' budget was increased from a $64 million dollar margin to a $72 million dollar margin. No consideration was given to anything other then that they wanted to get the company's consolidated number up. I also think that since the numbers dictated were not attainable, they represented numbers that were misleading to anyone who would rely on them.

So what happens next? How do we make plan? The same thing that has been happening when corporate finally realizes that the numbers that were dictated cannot be met; *we sell land*. As an employee and a stockholder, I am concerned about this risk and the opportunity that is lost because of it. Here's my criticism and recommendation: when the budgets were presented, corporate, instead of directing everyone to increase their numbers, should have engaged the division presidents and worked with them to develop a strategy to fill the gap. The gaap being the number they wanted to get to and the real-attainable numbers that the divisions had on the proposed budgets for 2003. We are all in agreement to grow the business. However, we should be doing it in real ways and not by selling land at the last minute.

Since this was not done almost one year ago, the opportunity of developing the proper approach to fill the gap was lost. Now the only solution is to sell land. To those that do not know how the budgets were unilaterally increased, it may appear that the divisions are not performing. The gap between the attainable margin that was on all our budgets and the desired margin that corporate wanted, has existed from the day the budgets were turned in. The sad reality is that this information was ignored by corporate.

In addition to causing the 2003 budgets to be misleading, the increased margin that was dictated by corporate creates a morale problem for the division management team. With regard to my division, our team is not going to make the budget this year unless we can sell enough land to make up the shortfall. Do you know what it feels like to double the size of your division (margin increased from $32 million in 2002 to $66 million in 2003) and know that you are far from making your bonus? It's not good and I can't imagine any company wanting to have a reward system that works this way.

In closing, if you do not think that my points have merit, you can simply write back and let me know that you feel like no action is warranted. I just want to be clear that I wish to remain anonymous and that I am concerned that if my name gets to Jerry, there would be significant retaliation.

Thanks for your attention. AG

JS 44
(Rev. 12/96)

# CIVIL COVER SHEET

The JS-44 civil cover sheet and the information contained herein neither replace nor supplement the filing and service of pleadings or other papers as required by law, except as provided by local rules of court. This form, approved by the Judicial Conference of the United States in September 1974, is required for the use of the Clerk of Court for the purpose of initiating the civil docket sheet (SEE INSTRUCTIONS ON THE REVERSE OF THE FORM.)

**I.(a) PLAINTIFFS**

ROBERT HANNA,

**DEFENDANTS**

WCI COMMUNITIES, INC., a Delaware for-profit corporation, ALFRED HOFFMAN, JR., individually, JERRY STARKEY, individually, MICHAEL GREENBERG, individually, HILLIARD M. EURE, III, individually, KERRY RUDOLPH, individually, and

**(b)** COUNTY OF RESIDENCE OF FIRST LISTED PLAINTIFF    PALM BEACH
(EXCEPT IN U.S. PLAINTIFF CASES)

COUNTY OF RESIDENCE OF FIRST LISTED DEFENDANT    PALM BEACH
(IN U.S. PLAINTIFF CASES ONLY)

NOTE:   IN LAND CONDEMNATION CASES, USE THE LOCATION OF THE
TRACT OF LAND INVOLVED.

**04-80595**

**(c)** ATTORNEYS (FIRM NAME, ADDRESS AND TELEPHONE NUMBER)
James W. Beasley, Jr., Beasley & Hauser, P.A.
505 S. Flagler Drive, Ste. 1500, West Palm Beach, FL 33401
561-835-0900, 561-835-0939 (Fax)

ATTORNEYS (IF KNOWN)

04CV80595    DTKH
JMH

**(d)** CIRCLE COUNTY WHERE ACTION AROSE:   DADE,  MONROE   BROWARD,  PALM BEACH   MARTIN,  ST. LUCIE,  INDIAN RIVER,  OKEECHOBEE  HIGHLANDS

**II. BASIS OF JURISDICTION**   (PLACE AN "X" IN ONE BOX ONLY)

| | |
|---|---|
| ☐ 1 U.S. Government Plaintiff | ☒ 3 Federal Question (U.S. Government Not a Party) |
| ☐ 2 U.S. Government Defendant | ☐ 4 Diversity (Indicate Citizenship of Parties in Item III) |

**III. CITIZENSHIP OF PRINCIPAL PARTIES** (PLACE AN "X" IN ONE BOX FOR PLAINTIFF
(For Diversity Cases Only)                       AND ONE BOX FOR DEFENDANT)

| | PTF | DEF | | PTF | DEF |
|---|---|---|---|---|---|
| Citizen of This State | ☒ 1 | ☐ 1 | Incorporated or Principal Place of Business In This State | ☐ 4 | ☒ 4 |
| Citizen of Another State | ☐ 2 | ☐ 2 | Incorporated and Principal Place of Business In Another State | ☐ 5 | ☐ 5 |
| Citizen or Subject of a Foreign Country | ☐ 3 | ☐ 3 | Foreign Nation | ☐ 6 | ☐ 6 |

**IV. ORIGIN**   (PLACE AN "X" IN ONE BOX ONLY)

| | | | | | |
|---|---|---|---|---|---|
| ☒ 1 Original Proceeding | ☐ 2 Removed from State Court | ☐ 3 Remanded from Appellate Court | ☐ 4 Reinstated or Reopened | ☐ 5 Transferred from another district (specify) | ☐ 6 Multidistrict Litigation |

Appeal to District Judge from
☐ 7 Magistrate Judgment

**V. NATURE OF SUIT**   (PLACE AN "X" IN ONE BOX ONLY)

| A CONTRACT | A TORTS | | FORFEITURE/PENALTY | A BANKRUPTCY | A OTHER STATUTES |
|---|---|---|---|---|---|
| ☐ 110 Insurance | **PERSONAL INJURY** | **PERSONAL INJURY** | B☐ 610 Agriculture | ☐ 422 Appeal 28 USC 158 | ☐ 400 State Reapportionment |
| ☐ 120 Marine | ☐ 310 Airplane | ☐ 362 Personal Injury – Med. Malpractice | B☐ 620 Other Food & Drug | | ☐ 410 Antitrust |
| ☐ 130 Miller Act | ☐ 315 Airplane Product Liability | ☐ 365 Personal Injury – Product Liability | B☐ 625 Drug Related Seizure of Property 21 USC 881 | ☐ 423 Withdrawal 28 USC 157 | ☐ 430 Banks and Banking |
| ☐ 140 Negotiable Instrument | ☐ 320 Assault, Libel & Slander | | B☐ 630 Liquor Laws | | ☐ 450 Commerce/ICC Rates/etc |
| ☐ 150 Recovery of Overpayment & Enforcement of Judgment | | ☐ 368 Asbestos Personal Injury Product Liability | B☐ 640 R.R. & Truck | **A PROPERTY RIGHTS** | ☐ 460 Deportation |
| ☐ 151 Medicare Act | ☐ 330 Federal Employers Liability | | B☐ 650 Airline Regs | ☐ 820 Copyrights | ☐ 470 Racketeer Influenced and Corrupt Organizations |
| B☐ 152 Recovery of Defaulted Student Loans (Excl. Veterans) | ☐ 340 Marine | **PERSONAL PROPERTY** | B☐ 660 Occupational Safety/Health | ☐ 830 Patent | ☐ 810 Selective Service |
| | ☐ 345 Marine Product Liability | ☐ 370 Other Fraud | B☐ 690 Other | ☐ 840 Trademark | ☐ 850 Securities/Commodities/Exchange |
| B☐ 153 Recovery of Overpayment of Veteran's Benefits | ☐ 350 Motor Vehicle | ☐ 371 Truth in Lending | | | ☐ 875 Customer Challenge 12 USC 3410 |
| ☐ 160 Stockholders' Suits | ☐ 355 Motor Vehicle Product Liability | ☐ 380 Other Personal Property Damage | **A LABOR** | **B SOCIAL SECURITY** | ☐ 891 Agricultural Acts |
| ☐ 190 Other Contract | ☐ 360 Other Personal Injury | ☐ 385 Property Damage Product Liability | ☐ 710 Fair Labor Standards Act | ☐ 861 HIA (1395ff) | ☐ 892 Economic Stabilization Act |
| ☐ 195 Contract Product Liability | | | ☐ 720 Labor/Mgmt. Relations | ☐ 862 Black Lung (923) | ☐ 893 Environmental Matters |
| **A REAL PROPERTY** | **A CIVIL RIGHTS** | **PRISONER PETITIONS** | | ☐ 863 DIWC/DIWW (405(g)) | ☐ 894 Energy Allocation Act |
| ☐ 210 Land Condemnation | ☐ 441 Voting | ☐ 510 Motions to Vacate Sentence | ☐ 730 Labor/Mgmt. Reporting & Disclosure Act | ☐ 864 SSID Title XVI | ☐ 895 Freedom of Information Act |
| B☐ 220 Foreclosure | ☐ 442 Employment | **HABEAS CORPUS:** | ☐ 740 Railway Labor Act | ☐ 865 RSI (405(g)) | ☐ 900 Appeal of Fee Determination Under Equal Access to Justice |
| ☐ 230 Rent Lease & Ejectment | ☐ 443 Housing/ Accommodations | B☐ 530 General | ☐ 790 Other Labor Litigation | **FEDERAL TAX SUITS** | ☐ 950 Constitutionality of State Statutes |
| ☐ 240 Torts to Land | ☐ 444 Welfare | A☐ 535 Death Penalty | ☐ 791 Empl. Ret. Inc. Security Act | A☐ 870 Taxes (U.S. Plaintiff or Defendant) | ☒ 890 Other Statutory Actions |
| ☐ 245 Tort Product Liability | ☐ 440 Other Civil Rights | B☐ 540 Mandamus & Other | | ☐ 871 IRS – Third Party 26 USC 7609 | A OR B |
| ☐ 290 All Other Real Property | | A☐ 550 Civil Rights | | | Sarbanes-Oxley |
| | | B☐ 555 Prison Condition | | | |

**VI. CAUSE OF ACTION**   (CITE THE U.S. CIVIL STATUTE UNDER WHICH YOU ARE FILING AND WRITE BRIEF STATEMENT OF CAUSE.
DO NOT CITE JURISDICTIONAL STATUTES UNLESS DIVERSITY.)

18 U.S.C. § 1514A

LENGTH OF TRIAL
via 10 days estimated (for both sides to try entire case)

**VII. REQUESTED IN COMPLAINT:**   CHECK IF THIS IS A CLASS ACTION
☐ UNDER F.R.C.P. 23

DEMAND $
Unknown

CHECK YES only if demanded in complaint:
JURY DEMAND:   ☒ YES   ☐ NO

**VIII. RELATED CASE(S)** (See instructions):
IF ANY

JUDGE

DOCKET NUMBER

DATE
6/30/04

SIGNATURE OF ATTORNEY OF RECORD
JW Beasley, Jr.

FLA. BAR. # 145750

FOR OFFICE USE ONLY

RECEIPT #  120726   AMOUNT  $150.00   APPLYING IFP   JUDGE   MAG. JUDGE